UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| YVONNE DIALS and WILLIE NELSON, | § | |
| | § | |
| Plaintiffs. | § | |
| v. | § | |
| | § | CIVIL ACTION NO. _____ |
| CAROLYN COLVIN, IN HER | § | |
| OFFICIAL CAPACITY AS THE | § | |
| COMMISIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | JURY REQUESTED |

**PLAINTIFFS' ORIGINAL COMPLAINT**

Plaintiffs Yvonne Dials and Willie Nelson bring this claim against Defendant Commissioner of the Social Security Administration ("Defendant" or "SSA") in her official capacity, and respectfully show Defendant failed to provide them equal opportunity to participate in or benefit from Defendant's programs and activities, by refusing their requests for a qualified sign-language interpreter and failing to accommodate their hearing impairment to ensure effective communication, in violation of federal law.

STATEMENT OF CLAIM

1. Yvonne Dials and Willie Nelson are deaf and bring this action for declaratory and injunctive relief, damages, attorneys' fees and costs against Defendant for failing to provide auxiliary aids and services, and denying their reasonable requests for accommodation, in violation of Section 504 of the Rehabilitation Act of 1973 (Section 504 or Rehabilitation Act), 29 U.S.C. §794.

PARTIES

2.      Plaintiff Yvonne Dials resides in Fort Worth, Texas.  She is deaf and is a qualified individual with a disability within the meaning of the Rehabilitation Act.

3.      Plaintiff Willie Nelson resides in Waxahachie, Texas.  He is deaf and is a qualified individual with a disability within the meaning of the Rehabilitation Act.

4.      Defendant Carolyn Colvin is the duly appointed Commissioner for the Social Security Administration ("SSA").  She is SSA's chief executive officer and, as such, responsible for implementing and enforcing the Social Security Act and for ensuring agency compliance with the Rehabilitation Act of 1973.  The SSA is an Executive Agency of the United States.  Defendant Colvin in her official capacity may be served by serving the United States as provided by Fed.R.Civ.Pro. 4(i)(1) and by sending a copy of the summons and complaint by certified mail to her, in care of the General Counsel of the Social Security Administration, Room 611, Altmeyer Building, 6401 Security Boulevard, Baltimore, MD 21235.  Fed.R.Civ.Pro. 4(i)(2).

JURISDICTION AND VENUE

5.      Pursuant to 28 U.S.C. §§1331, 1346(a)(2), and 2201, this Court has jurisdiction over Plaintiffs' claims. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because the events or omissions complained of occurred within the Dallas Region of SSA, in the Waxahachie and Fort Worth offices, within this judicial district.

FACTUAL ALLEGATIONS

A.      *Defendant's Failure to Provide Auxiliary Aids and Services to Ms. Dials and Ensure Effective Communication.*

2

6.      Ms. Yvonne Dials has been deaf from birth, meaning that she is pre-lingually deaf or culturally deaf.  Her first language is American Sign Language, and it is the language she uses for communication.  She has limited knowledge of written English, and reads at about a second grade level. Passing written notes is wholly inadequate to effectively communicate with her about changes in her benefits, her rights and obligations under Social Security. Defendant failed to provide Ms. Dials equal opportunity and access to its programs, benefits, and services by refusing her requests for a qualified interpreter to accommodate her hearing impairment, delaying those services, and failing to achieve effective communication.

7.      Between 2007 and 2012, Ms. Dials received notices from SSA regarding changes in her benefits, and in some instances allegations of overpayment. Every time Ms. Dials went in to the Fort Worth office of SSA, Defendant refused to provide a sign language interpreter, in spite of her making formal requests for one. Her deceased husband, the late Nathan Dials, was also deaf.  SSA also alleged that it had made overpayments to him. He passed away in September of 2009.

8.      In late 2006 Ms. Dials was diagnosed with cancer.   After intensive treatment, she went into remission.

9.      In June of 2013, in the course of a meeting with the Texas Department of Rehabilitative Service (DARS), she learned that SSA had listed her primary disability as "cancer" rather than "deafness." She therefore went to the Fort Worth office of SSA to have them remove "cancer" as her primary disability, and to change it to "deafness." After failed attempts at communication, she asked for a sign language interpreter. Instead of arranging for an interpreter, the SSA representative brought out an Ubi-Duo machine

3

for communication.  An Ubi-Duo machine is an outdated machine where each person has a screen and a keyboard and messages are typed to the other person, all in written English.  Similar to the attempted communication by notes, Ms. Dials was unable to have effective communication with the representative with this technology due to her limited knowledge of written English for complex, high-stakes communication.

10.    The SSA representative then attempted to enlist the services of a Ms. Joan Lathrop, a woman who happened to be at the SSA office on behalf of her daughter, and who knew some sign language. It was highly unorthodox and inappropriate to attempt to enlist informally a third party to serve as an interpreter.  Moreover, it is contrary to the requirements of Section 504.   Ms. Lathrop appropriately declined to serve in that capacity.

11.    In late August 2014, Ms. Dials once again received notices of changes in both her personal benefits and her disabled widow's benefits. On or about October 25, 2014, Ms. Dials went to Defendant's Fort Worth office to inquire about a reduction in her benefits and further allegations of overpayment. She asked if a sign language interpreter was available to assist her, but was informed by Defendant's employee that no sign language interpreter was available. Defendant's employee attempted to communicate with Ms. Dials with paper and pen, but it was ineffective.

12.    Because Defendant consistently and repeatedly denied Ms. Dials an interpreter during all of her visits, and further denied to her effective communication and access to services, she continued to insist on an interpreter and asked when she could meet with an interpreter present. The representative gave Ms. Dials an appointment for December 19, 2014—nearly a month and a half out—and told her she would try to

4

arrange for an interpreter, without any assurance.  Ms. Dials subsequently asked for the appointment to be rescheduled. She was given a new appointment for February 17, 2015 another two months out.

13.     Hearing individuals who go into Defendant's offices are able to meet with a representative the same day. By forcing Ms. Dials to attempt communication by paper and pen, and then to wait such a long time to meet to discuss her Social Security benefits without the assurance of a sign language interpreter, Defendant failed to afford Ms. Dials an opportunity to participate in or benefit from Defendant's aid, benefit, or service in a way equal to that afforded hearing individuals.

14.     Ms. Dials was concerned that there would be no sign language interpreter when she went to her appointment. After consulting with a deaf advocate and attorney, Ms. Dials was advised to create a record of her request for an interpreter by sending a letter by certified mail to the Fort Worth office of SSA. She had to receive assistance in drafting the letter. Again, the measures Ms. Dials had to take to ensure effective communication on her behalf were unequal to those required of a hearing individual who needs to discuss matters with a Social Security representative.

15.     Because of those efforts and her insistence, when Ms. Dials met with a social security representative in February, there was a sign language interpreter present. However, the Social Security representative would not let her question the alleged overpayments, effectively cutting off Ms. Dials attempts at communication and to gain information.  The social security representative clearly lacked training on communicating with a deaf person through a sign language interpreter.

16.     Instead, the representative simply provided a form for requesting a waiver regarding the overpayment.  The waiver form does not allow one to challenge the underlying overpayment, only to seek terms of repayment.  Ms. Dials did not fully understand the form and the process, and she asked the representative for help in preparing the form, since she finally had an interpreter present to get appropriate assistance from the representative.  Social Security representatives regularly help hearing people prepare these forms.  However, the Social Security representative refused to assist her with the form, even with the help of the interpreter present. Ms. Dials has since had to seek separate legal counsel regarding the alleged overpayment.

B.     *Defendant's Failure to Provide Auxiliary Aids and Services to Mr. Nelson and Ensure Effective Communication.*

17.     Willie Nelson is deaf.  He has been deaf since birth, meaning that he is pre-lingually deaf or culturally deaf.

18.     American Sign language is his first language, and he uses it to communicate. English is a foreign language, and written English, based on phonetics, is doubly foreign to him.  He has a very limited understanding of English, and at most can communicate using basic English in short sentences.

19.     At the age of 13 Mr. Nelson was enrolled at the Illinois School for the Deaf where all the teachers signed proficient American Sign Language (ASL). At the Illinois School for the Deaf, surrounded by a full faculty and staff who could communicate in ASL, Mr. Nelson was able to earn his high school diploma.

20.     Mr. Nelson lives an active and productive life even though he cannot hear. It has always been important to him to live an independent life in which he can effectively communicate with people and make his own decisions.

21.     In May of 2013 Mr. Nelson received a letter from SSA that said he owed SSA over $70,000 due to an alleged overpayment. The alleged overpayment arose between 2009 and 2011.  During that time Mr. Nelson made repeated visits to the SSA offices in Temple and Waxahachie, Texas to inform SSA of his employment and to seek clarification regarding the checks he received.  In each case, he asked for a sign language interpreter to ensure effective communication, but his request was denied, and he was forced to attempt communication by written notes.

22.     In late May of 2013, Mr. Nelson went to the SSA office in Waxahachie to inquire about this new letter. Because Defendant had denied previous requests for an interpreter, Mr. Nelson brought a friend and co-worker of his, Ms. Amy Stevens to help him at the meeting. Ms. Stevens can hear, and she knows some sign language, but she is not a qualified interpreter.

23.     Initially, Ms. Stevens was allowed to help Mr. Nelson when they arrived at the Waxahachie Social Security office and spoke to a receptionist. Ms. Stevens assisted as much as she could, even though she is not a certified sign language interpreter, because there was no sign language interpreter at the Waxahachie Social Security office.

24.     Mr. Nelson and Ms. Stevens waited in the reception area for Mr. Nelson to receive assistance. Mr. Nelson was then called to a back office to meet with a Social Security officer regarding the letter. The Social Security officer told Ms. Stevens that she could not help interpret for Mr. Nelson and that she had to leave.

25.     Upon hearing this, Mr. Nelson signed to Ms. Stevens that he wished that she be allowed to interpret because he feared that he wouldn't understand the meeting clearly without assistance. Ms. Stevens verbally conveyed to Defendant's employee that Mr. Nelson wanted her to stay and assist in interpreting the meeting.

26.     Defendant's employee denied his request to allow his friend to stay and assist him.  Mr. Nelson was left to try to communicate with the employee using paper and pen and in written English. Using the paper and pen he again specifically requested a sign language interpreter. Defendant's employee got mad, took the paper and pen away from Mr. Nelson, and refused his request for an interpreter.

27.     Without a sign language interpreter, Mr. Nelson was confused and could not understand the information being transmitted in the meeting. Defendant's employee failed to give consideration to Mr. Nelson's requests and denied him a means to communicate effectively. Thus, Mr. Nelson was not afforded an equal opportunity to participate in and enjoy the benefits, programs or activities of the SSA. Apparently, Defendant's employee informed Mr. Nelson that he owed the Defendant money.

28.     Mr. Nelson was confused about how the alleged overpayment was accrued and what Defendant's employee expected him to do because he could not understand the explanation without a sign language interpreter.

29.     After this confusing meeting, but before leaving the Waxahachie Social Security office, Mr. Nelson communicated with Ms. Stevens. He explained to Ms. Stevens that he had been confused during the meeting and that apparently the SSA representative was saying that he owed them money.

30.     Mr. Nelson was not informed of his rights to contest or seek reconsideration of the overpayment determination. The Social Security officer gave Mr. Nelson a form that he did not understand.  Apparently it was a waiver application form in connection with the debt he allegedly owed. Before Mr. Nelson and Ms. Stevens left, Ms. Stevens asked an official at the Waxahachie Social Security office to provide a sign language interpreter to help Mr. Nelson fill out the waiver application form. Ms. Stevens is not a Social Security expert and did not feel as though she could accurately communicate with Mr. Nelson about the information the waiver application form required. Once again, the Waxahachie Social Security office refused to provide Mr. Nelson with an interpreter.

31.     Left with no other options, Mr. Nelson and Ms. Stevens left the Waxahachie Social Security office and went home to fill out the waiver application form. They wrote on the waiver application form that Mr. Nelson was deaf and could not understand the earlier meeting at the Waxahachie Social Security office, and that he would need a sign language interpreter for any future meeting or hearing regarding his debt.  Mr. Nelson went to the Waxahachie SSA office to physically turn in the waiver application form by placing it in the mail slot inside the waiting room.

32.     Mr. Nelson subsequently received notice that a hearing had been scheduled with an officer regarding the waiver application. Because of his previous experience with the Waxahachie Social Security office, Mr. Nelson knew that Defendant would not allow Ms. Stevens to interpret for him, so on July 12, 2013 he attended this hearing alone.

33.     Once again, he used paper and pen to request a sign language interpreter, but again the hearing officer at the Waxahachie SSA office told him that there was no sign language interpreter. The hearing officer refused to get an interpreter, and instead brought out an Ubi-Duo machine. Like many deaf people, Mr. Nelson's first language is not English but American sign language, so typing in English instead of writing in English has no effect on his ability to understand the language. He had never even heard of or seen an Ubi-Duo machine up until this meeting. Mr. Nelson tried to explain, using paper and pen, that he did not know what the machine was nor did he understand how to use it.

34.     Because there was no interpreter, Mr. Nelson again had to communicate using paper and pen and in English, which is not his first language. As hard as he tried, his attempts to communicate with the SSA officer were in vain. Mr. Nelson could not even successfully communicate that he did not understand what was going on.

35.     The SSA officer wrote out a note for Mr. Nelson to sign. Again, because English is not Mr. Nelson's first language, he did not understand what the full meaning and impact of what he was signing. Frustrated and exhausted with the entire process and still not understanding what was going on, Mr. Nelson felt like he had to sign the paper. The man then typed up the handwritten notice and had Mr. Nelson sign again. Apparently these documents stated that Mr. Nelson was aware that he owed the SSA over $70,000 and that his request for a waiver had been denied.

36.     After the hearing, the SSA sent Mr. Nelson a monthly bill and payment coupon, which he used to begin to pay down the alleged debt. In October 2013 Mr. Nelson moved from Granbury, Texas to Waxahachie. He has repeatedly gone back to the

Waxahachie Social Security office to inform them of his change of address, but has not received another bill or payment coupon. SSA has failed to provide him with a sign language interpreter for these visits, as he tried to understand his legal rights and obligations regarding the alleged overpayment. He has done this all while working and struggling to make ends meet, and despite the fact that he has to take time off work to go to the Waxahachie Social Security office.

37.     His experiences have taught him that the Defendant is not willing to consider his requests for an interpreter so that he may communicate effectively about his social security account and his financial responsibilities. Due to Defendant's repeated failures, and at times flat out refusals, to provide Mr. Nelson with appropriate auxiliary aids and services, he is worried and confused about what he may owe and what his responsibilities are to Defendant, and has had to seek separate legal counsel regarding the alleged overpayment and obligations.

C.     *Defendant's Failure to Provide Auxiliary Aids and Services to Other Individuals and Ensure Effective Communication: Mr. Gilbert Anguiano*

38.     Mr. Gilbert Anguiano resides in Fort Worth and is also pre-lingually deaf. Sign language is his primary language. In order to communicate effectively with a hearing person who does not know sign language, he must use the services of a sign language interpreter. Mr. Anguiano has special needs due to a cognitive disability, and requires a deaf interpreter for the communication of complex information. A deaf interpreter is a deaf individual who is fluent in sign language and understands deaf culture.   The deaf interpreter provides further contextual interpretation to a deaf individual for communication transmitted by a hearing sign language interpreter.

39.     In the course of 2013 and 2014, Mr. Anguiano went to Defendant's office on multiple occasions in Fort Worth to discuss his pay being garnished. Mr. Anguiano was forced to try to communicate with notes, and Defendant refused to provide interpreters, even though he requested and required them for effective communication. Frustrated because he still did not understand why Defendant was garnishing from his monthly check, Mr. Anguiano sought assistance from the Goodrich Center for the Deaf in November of 2014. A social worker there arranged for an interpreter to meet him at the Fort Worth Social Security office.  At the office, Mr. Anguiano was finally able to gather some information about the determinations Defendant had made regarding his account, but only with the help of the interpreter that he obtained through the Goodrich Center. He disagrees with Defendant's determination of the overpayment and subsequent garnishment, but still does not understand how to contest it. He is seeking separate legal advice on the matter.

40.     As a result of the garnishment from his check, Mr. Anguiano had to move into a shelter and can barely make ends meet. Defendant failed to afford Mr. Anguiano an opportunity to participate in or benefit from Defendant's program in a way equal to that afforded others.

CLAIM: VIOLATION OF SECTION 504

41.     Ms. Dials and Mr. Nelson each bring a claim under the Rehabilitation Act because Defendant discriminated against them on account of their disability by not providing them with effective communication through auxiliary aids and services such as a qualified interpreter.

42.     "No [person] shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving federal funding assistance." 29 U.S.C. § 794(a).

43.     Section 504, as promulgated in 45 C.F.R. §85.21(b)(1)(ii), mandates that any program or activity conducted by Defendant, may not "afford a qualified individual with handicaps an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." Additionally Section 504, as promulgated in 45 C.F.R. §85.21(b)(1)(iii), prohibits Defendant from providing "a qualified individual with handicaps with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement provided to others."

44.     Moreover, Section 504, as promulgated in 45 C.F.R. §85.51(a), mandates that Defendant "shall take appropriate steps to ensure effective communication with applicants, participants … and members of the public." Section 504, as promulgated in 45 C.F.R. §85.51(a)(1), requires that in providing effective communication, Defendant "shall furnish appropriate auxiliary aids where necessary to afford an individual with handicaps an equal opportunity to participate in, and enjoy the benefits of, the program or activity" conducted by Defendant. Furthermore, 45 C.F.R. §85.51(a)(1) requires that Defendant give primary consideration to the requests of the individual with handicaps in determining what type of auxiliary aid is necessary.

45.     Providing sign language interpreters would not result in a fundamental alteration in the nature of Defendant's programs or activities, nor would it constitute an undue financial or administrative burden.

46.     Defendant's refusal to accommodate reasonable requests to provide interpreters for Ms. Dials and Mr. Nelson violates the Rehabilitation Act and subjects them and other people with hearing impairments to discrimination on the basis of their disability.

## RELIEF REQUESTED

### Declaratory Relief

47.     Plaintiffs are entitled to a declaratory judgment concerning Defendant's violations of the law. Specifically, Plaintiffs are entitled to declaratory relief regarding the rights of individuals with disabilities to have an equal opportunity to participate in or benefit from Defendant's services; to be provided with the appropriate auxiliary aids to ensure effective communication, in this case sign language interpreters; and to be given primary consideration in determining which auxiliary aid is necessary.

### Injunctive Relief

48.     Plaintiffs will continue to experience unlawful discrimination as a result of Defendant's refusal to comply with the Rehabilitation Act. Injunctive relief is necessary so Ms. Dials, Mr. Nelson, and all individuals with hearing disabilities can enjoy Defendant's services, aids, and benefits equally as required by law. Injunctive relief is also necessary to require Defendant to modify, develop, and follow proper programs, policies, procedures, and training for accommodating patients who have hearing disabilities, including Plaintiffs.

### Damages

49.     Ms. Dials and Mr. Nelson are entitled to compensatory relief for the mental pain and anguish they suffered as a result of Defendant's conduct. Section

505(a)(2) of the Rehabilitation Act declares that the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 ... shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title." 29 U.S.C.A. §794a.

Attorneys' Fees and Costs

50.     Plaintiffs are entitled to reasonable and necessary attorneys' fees, litigation expenses, and court costs, pursuant to the Rehabilitation Act, 29 U.S.C. §794a.

JURY REQUEST

51.     Plaintiffs respectfully demand a jury trial pursuant to Fed. R. Civ. P. 38(a) and (b).

PRAYER FOR RELIEF

Therefore, Plaintiffs respectfully requests that this Court order the following relief:

A. A permanent injunction, requiring Defendant, its agents, servants, and employees, and all persons acting in concert with Defendant, to provide appropriate auxiliary aids and services, including interpreter services, to people with hearing disabilities, in order to ensure effective communication and an opportunity to participate in or benefit from the aid, benefit, or any service provided by Defendant in a manner equal to that afforded others, and to eliminate all barriers described herein that prevent Plaintiffs from having equal opportunity and access; specifically requiring Defendant to develop effective policies, practices, training, and procedures for providing qualified interpreter services for people with hearing disabilities, and enjoining Defendant from violating the Rehabilitation Act, and from discriminating against Plaintiffs in violation of the law;

B. A declaratory judgment that Defendant's failure to reasonably accommodate Plaintiffs prevented them from fully accessing SSA's aid, benefit, or services, in violation of the Rehabilitation Act;

C. Award Plaintiffs compensatory relief for the mental pain and anguish they suffered as a result of Defendant's conduct;

D.  Find that Plaintiffs are the prevailing party in this action, and order Defendant liable for their reasonable attorneys' fees, costs, and litigation expenses; and

E.  Grant such other and additional relief to which Plaintiffs may be entitled.

Dated: May 15, 2015                          Respectfully submitted,


                                             /s/ Joseph P. Berra

                                             Joseph P. Berra
                                             State Bar No. 24027144
                                             James C. Harrington
                                             State Bar No. 09048500
                                             Wayne Krause Yang
                                             State Bar No. 24032644

                                             TEXAS CIVIL RIGHTS PROJECT
                                             1405 Montopolis Dr.
                                             Austin, TX 78741
                                                (512) 474-5073 (phone)
                                                (512) 474-0726 (fax)

                                             ATTORNEYS FOR PLAINTIFFS

16